Good morning, everyone. I'm Judge Sung. My chambers are here in Portland, Oregon, and I'm very happy to be sitting with my colleagues Judge McEwen and Judge Fitzwater, who's sitting by designation from the Northern District of Texas, and we greatly appreciate his willingness to come help us out here. We'd like to thank our excellent court staff, especially our courtroom deputy today, Ms. Dodds, and we have a couple matters that are submitted on the briefs, United States v. Chuck Lopez and Castillo-Escalante v. Bondi. We'll take up the remaining cases in the order they appear on the calendar, and I believe first we have Lankford v. Miller. Good morning, Your Honors, and may it please the Court, Julie Vandiver from the Federal Public Defender's Office. On behalf of Petitioner Appellant Joseph Lankford, I plan to reserve five minutes for rebuttal. The prosecution needed to convince all 12 members of the jury that Mr. Lankford not only intended to shoot his gun, but that he intended to kill his wife. There was no question that Mr. Lankford shot the gun, so the case hinged on his mental state. The trial defense was that Mr. Lankford, who had drank heavily that day and evening, acted recklessly but not with intent to kill when he fired his weapon. The state court found that Strickland's first prong was satisfied because a reasonable trial attorney presenting this defense would have tested Mr. Lankford's blood sample for the presence of Valium, and the state court also found that the results of this test, which were performed in post-conviction proceedings, would have strengthened the trial defense. The state court, however, unreasonably found that Mr. Lankford was not prejudiced by his counsel's failure because evidence that he had taken Valium that evening was not likely to change the verdict. The court should find that this prejudice ruling was unreasonable because had just one juror doubted whether Mr. Lankford meant to kill his wife, the result of the trial would have been different, and it is sufficient to show prejudice if the court cannot be confident that the verdict would not have been the same. With respect to the guilt phase, Mr. Lankford has offered two theories of prejudice, and one relates to the recklessness defense, and the state in their brief minimizes the impact that Valium, conclusive evidence that Mr. Lankford had taken Valium, would have had on that defense in two ways. First, the state argues the trial defense focused on whether or not the gun misfired and that whether or not Mr. Lankford was also impaired by Valium was independent of that defense. And second, the state argues that the petitioner or that the jury was aware that the petitioner may have had Valium in his system. I'd like to discuss why both of these are an oversimplification of the record, and in this close case, why conclusive evidence that Mr. Lankford had Valium in his system and in amounts showing that he had taken it that night when the jury knew that he was drinking heavily would have could reasonably have changed the at least one juror's mind regarding intent. So that whether the gun misfired was not the thrust of the defense. It was an argument made by the defense team among many. And the defense really focused on reasonable doubt on the question of intent from the beginning of trial. And of course, as the court well knows, the defense is not obligated to put forward a counter theory of what happened, you know, and to prove that up. And when we're thinking about the prejudice inquiry, the court should imagine this evidence in the hands of capable, effective counsel. So the court does not have to imagine that the trial record would have been verbatim as, you know, we see in the transcript had trial counsel had this or different arguments respecting his intoxication and how it impacted his ability to form intent or what the evidence showed regarding the reckless nature of his behavior. And the argument that a misfire was the only viable defense really hinges on a contention that there was overwhelming evidence that there were more than two gunshots fired. And I think the record rebuts that. So first, there was only one bullet recovered in this crime scene, despite the police really combing the room for more gunshots or another bullet. And the main testimony regarding the events of that evening came in through Jessica Montez, Ms. Twigg's daughter. And she was the person who was going in and out of the bedroom where Mr. Lankford and Ms. Twiggs were. And she provided really this narrative of three gunshots. And there was reason to doubt that testimony. The jury had a reason not to credit her version or her recollection regarding three gunshots. We know that she was extremely distraught, understandably so. But the evidence shows that she was, I think, almost hysterical after these events. We know that she was under the influence of marijuana because she and her mother had smoked marijuana earlier that day. And in cross-examination, it came out that she had initially told the police that there were only two gunshots. So there was definitely a reason for the jury not to credit or to doubt that there were three gunshots. And the other witness testimony was likewise unclear or equivocal regarding the amount of gunshots. Damien Montez says he was not sure regarding the amount of gunshots. And Jessica Lee, another person that was in the house, thought that the first noises that she heard might have been like the table being struck. And finally, on this point, even assuming that the gun misfiring was the most viable defense or the thrust of the defense, the jury might have been more likely to credit that defense had they known that the operator of the weapon was even more impaired than they were aware of at trial. So I'd like to move on to the point that the jury was aware that Mr. Lankford may have been under the influence of Valium. And this argument fails to appreciate how truly minimal the evidence regarding Valium was in the trial record. It was scant and the mentions of it were uncertain. Just take a sip of water. While you're taking a sip of water, counsel, regardless of the number of gunshots, would you address the proximity of one of the bullets to her head and what significance that has or doesn't have? Sure. Yes. So there was testimony at the trial by the forensic gun expert that the bullet was in a range between 1 and 12 inches from the victim's head. And so the testimony was this was not a close range wound because if it had been, there would have been like burning on the skin. It was an intermediate range wound. And this bedroom was very close quarters. So the bed was close to the wall and the desk was between the wall and the bed. So I know that there is some discussion and there was discussion at the trial of whether he was seated on the bed, laying in the bed, standing up. And everything in this room is very close. And so I think that there are multiple scenarios that could make sense with the forensic evidence given the close quarters of the bedroom. I wanted to turn your attention to the expert that you had, Dr. Julian. And you've already indicated, of course, that the state court recognized that there was ineffective assistance at the first step because of the whole processing and failure to test. But then as I read Dr. Julian, it seems to me he didn't actually give an opinion as to this combination of Valium and alcohol and how that would impact the ability to form an intent. And it seems to me that that's kind of a gaping hole here. I disagree respectfully, Your Honor. So in post-conviction, he gave a declaration, which I agree is quite short. But he says that with the additional evidence of knowing the amount of Valium that was in Mr. Lankford's blood, that his equivalent blood alcohol concentration would have been well above a 0.25. And he says he would have been able to conclusively testify regarding the same conclusions that he made at trial or something like that. And at trial, he testified that a person at a 0.25 blood alcohol level is going to start having fragmentary blackouts. And at a 0.30 level, they will have a complete blackout at which they would be totally unable to form intent. But under his theory, a person who is in a blackout stage, even if it's fragmentary during that time, is not able to form intent. So I agree that he didn't say Mr. Lankford could not have formed intent at all during any of this period. But his affidavit from post-conviction was sufficient to allow a jury to infer that at the time that Mr. Lankford shot his weapon, he could have been in a fragmentary blackout, thus unable to form intent. But the jury did hear that. The jury heard that testimony, but they were under the impression that his blood alcohol level was an equivalent of a 0.22, because they didn't know about the Valium. And so it necessarily, at trial, was at a threshold underneath this fragmentary blackout level. And in post-conviction, we're pushed into that level where that is a possibility that a jury could credit. And I see that I'm into my rebuttal time, so I'm going to reserve the rest of it. Thank you. May it please the Court, I'm Erin Gally here on behalf of the Superintendent of Snake River Correctional Facility. The District Court correctly denied Petitioner's request for habeas corpus relief because Petitioner did not demonstrate that the Court of Appeals, the Oregon Court of Appeals, was unreasonable in its determination that Petitioner failed to establish prejudice on his inadequate assistance of counsel claim. And I would like to address the comments that counsel just made, but I plan to start by pointing out or discussing what I think are Petitioner's two biggest hurdles to relief in this case. And that is the evidence that the jury actually heard about Petitioner's ability to form intent and the problems with Dr. Julian's testimony, the reasons why it's not as persuasive as Petitioner claims. So on the first issue, perhaps the best evidence of the effects of alcohol on a person's ability to intend their actions is what that person says and does and how they behave at that moment in time. And often in cases, the jury is required to make fact findings about that based on second hand after the fact, evidence, testimony from people who had observed the person at that time. This case, however, is perhaps a rare case in that the jury got to see and the trial court in making its suppression ruling got to see evidence of essentially firsthand evidence of what the Petitioner, how he was behaving, how he was acting, how he was interacting with other people at this moment in time or very close in time to the time that he shot his wife. So the jury saw, the jury heard the 911 call, the jury saw video of Petitioner's arrest and walking out to the squad car, and then the jury and the court got to hear two long interviews with detectives later that started roughly an hour after the shooting. That evidence was so compelling and the criminal court's discussion of it, which is quoted in the record, describes it as sort of undeniable that this Petitioner was coherent, lucid, able to interact with people, wasn't indicating, you know, wasn't responding incorrectly to questions or stimulus, wasn't slurring his words, was able to walk, and that evidence was not just buttressed by that firsthand sort of evidence, but all the people who were interacting with Petitioner during that time, although they were aware that he was under the influence, believed him to not be so intoxicated that he couldn't. The motion to suppress, if it had been successful, because that's one of the issues, would not have affected the 911 call and the video of the arrest, is that correct? So, Your Honor, if your question is, if the 911, if the motion to suppress had succeeded, what would have been excluded? Petitioner's state, it's a little unclear exactly what would have been suppressed, but if Petitioner got everything he wanted, then yes, I think the 911 call would have been excluded and his interview with those two detectives, or sorry, with the two detectives. Well, it was about his ability to consent, right, to, that was the basis for the motion to suppress, was about his ability to consent or to waive his Miranda rights? Yeah, so if he was, if Petitioner had been able to demonstrate, assuming I'm understanding Your Honor's question, if Petitioner had been able to demonstrate that he lacked the ability, that he didn't understand his rights and he didn't understand the consequences of waiving those rights, then what probably, we would have then had another discussion about what was going to need to be suppressed and then in this post-conviction context, whether that would have affected the outcome of the motion to suppress, sorry, of the outcome of the criminal trial itself. Petitioner gave another interview the next day after another Miranda waiver and the post-conviction court made allusion to the fact that he said essentially the same thing in both those interviews. So to the extent that some parts might have been suppressed, other parts, other statements that he made may very well have still been admissible and in the event that this Court disagrees with the Oregon Court of Appeals about whether Petitioner established that he would have succeeded on his motion and that's what he has to show, not just a reasonable probability, but success of the motion to suppress, then we quite possibly do need further consideration about what the effect of the motion to suppress would be because the courts didn't have to go that far. So the second hurdle that Petitioner has is the persuasiveness of Dr. Julian's testimony and there were sort of two reasons to not give full credit to Dr. Julian's testimony. The first is that he based his extrapolation, his estimate of what Petitioner's blood alcohol content would have been at the time of the shooting on the assumption that the Petitioner had not consumed any alcohol close in time to the shooting. In other words, he assumed that Petitioner's blood alcohol had consistently been falling since that time and he acknowledged in his criminal trial testimony on cross-examination that it would have made a difference had he known that Petitioner consumed alcohol in the driveway and we know that Petitioner, in his own words to one of the detectives, consumed two 16-ounce beers and a half a pint of Hennessy when he was driving down the driveway. So that new information, which Dr. Julian had not accounted for, affects his extrapolation and that's what the State Post-Conviction Trial Court found is that Dr. Julian was unaware of some of the circumstances of that night when he gave that opinion. And the second sort of hurdle to the persuasive value of Dr. Julian's testimony is that he never quite says what Petitioner sort of suggests he was saying here. He never says that a person at 0.25 would have lacked the ability to form intent. He says that a person at 0.3 or over would experience blackouts and that he sort of suggests that blackouts and an ability to inform intent are linked. And so he makes that suggestion, but he doesn't say that what this, even assuming that his extrapolation was correct, he doesn't say in his post-conviction declaration that that would have been enough to prevent the Petitioner from forming intent. What he does say though is that now that he knows what the level of the Valium was, he says his intoxication was well above the equivalent of a blood alcohol of 0.25.  That's correct. And so combining that with his trial testimony, that would mean that in his opinion the Petitioner was experiencing fragmentary blackouts. But the Post-Conviction Court also found that to the extent that Dr. Julian would have testified that at 0.25 this Petitioner was unable to form intent, that the Post-Conviction Court rejected that opinion, finding it not, I think, finding it not credible or at least not supported. So we're in a bit of a gray area with exactly what Dr. Julian believed, where he would have pinpointed this Petitioner's blood alcohol content. It's not enough to say that this Petitioner was unable to form intent, which was one of the two theories he advanced in the Post-Conviction level. So I guess if you're looking here though at the habeas standard and also really at the prejudice is what we're focusing on here, had the jury understood that not just that he may have taken, but that he had taken this so-called therapeutic dose, I think they call it, that well could have changed the notion of this fragmentary blackout, giving some reasonable doubt to his ability to form intent, couldn't it? Well, I mean, that probably is the state's toughest argument in this case, is that point itself. But again, what we're talking about here is a minute additional quantum of evidence in Petitioner's favor. And there's a difference between something that's conceivably could have made a difference, which maybe this evidence conceivably could have made a difference, and one that would have made a difference to the point where we can look at it and say, this undermines the confidence in the jury's verdict. And on the other side of the equation, given the problems with Julian's inability to sort of definitively say what Petitioner was capable of doing, and the fact that his extrapolation was not correct, compared with the fact that the jury was able to see firsthand evidence of how the Petitioner was interacting at that moment in time, and able to tell that he, you know, he did not seem impaired to the point, at least, you know, that he was able to form, he was unable to form intent. So although there might have been some small difference, some small benefit, assuming that Dr. Julian was saying that with this new evidence, and assuming that he's, you know, you know, sort of forgetting for a moment the fact that he didn't count, he didn't take into account the alcohol that Petitioner consumed in his driveway, that the jury would have, even though there was maybe a little more evidence in Petitioner's favor, it's not enough to rise to the level of something that casts a doubt on the jury's verdict here. Or at least the Oregon Court of Appeals could reasonably reach that determination. I have a couple of other points I want to make in response to some of the more specific arguments Petitioner's counsel made. Petitioner's counsel notes that there was some dispute about the number of gunshots and that the, and that as a part of disputing the gunshots, Petitioner's arguing that his defense wasn't necessarily resting only on the proposition that the gun misfired and that he was reckless as to whether the gun misfired. The evidence in the record about the gunshots didn't come only from the two people that were in the house that night, Jessica and Damien. There were people outside the home that had arrived to pick up some of their children that also testified about hearing gunshots and that was Jessica Lee and Shane Lee and I believe they both said that they heard three gunshots as well. And I think we have maybe a significant disagreement over how to read what Petitioner was arguing to the jury. Certainly Petitioner's correct that that his attorney was arguing generally that the state had to prove a mental state, the state had to prove that he acted intentionally, but that he, that the evidence would show that he did not act intentionally and instead acted recklessly. But in order just to explain all the evidence, the defense had to choose between asserting sort of a categorical, didn't have the ability to form intent, versus really picking apart what the state's evidence was. And the key was this gun that could only fire two bullets and had to be reloaded. And so to respond to the state's theory that there were three gunshots, which would have required reloading, which would demonstrate some kind of intent on this Petitioner's part because reloading would have involved going to the safe, getting the bullets out of the safe, opening the gun and putting two new bullets in, the defense posited a different way to explain that physical evidence, that he had been reckless as to whether the gun contained a live bullet when he fired it at his wife. And so in presenting this to the post-conviction court, that was the way it was the defense that the gun had misfired first, and that Petitioner was in a recklessness to the state of the gun, or the defense that he just didn't have the capacity to form intent at all. He was just too extremely intoxicated. Today, Petitioner talks about, well, maybe there were some additional arguments that these attorneys could have made. Who knows what would have happened if the attorneys had this evidence, how things would have evolved. But that argument maybe is fairly presented in sort of like a general prejudice argument the Petitioner is making. But the Oregon Court of Appeals, the state post-conviction court, didn't have a chance to consider that particular theory, didn't pass on that particular theory and consider whether there would have been other arguments that could have been made or other pitches to the jury that could have been made. And so to the extent, I mean, I guess I would encourage this court not to find that the Oregon Court of Appeals acted unreasonably in rejecting Petitioner's prejudice argument on the basis of an argument that the court didn't consider. And unless the court has any other questions, I'd close by asking this court to affirm because Petitioner has not shown that the Oregon Court of Appeals made an unreasonable determination and he's not shown that counsel's error was serious enough to deprive him of a trial whose result was reliable. Thank you. Regarding whether or not Mr. Lankford's, the way that he presented, would have foreclosed either of a recklessness defense or a no-intent defense, this is one of the reasons why the valium was so important because unlike alcohol, jurors don't have a lay understanding of how a person is going to present when they have mixed valium and alcohol. And Dr. Julian testified that a person may come into surgery having taken Versed, which is the equivalent to alcohol and valium, and look normal, but in fact be unable to sign a surgical consent. And it has to do with their ability, their judgment, and their ability to think. And regarding whether or not Dr. Julian's opinion regarding the alcohol levels was inaccurate because Mr. Lankford consumed a lot of alcohol in the car on the way home, Dr. Julian testified that the body takes up alcohol fairly rapidly. I think he says like in 10 or 15 minutes you would expect it to fully be in your blood. And there's a testimony that Mr. Lankford didn't just get out of his car and shoot his wife. He had been home for some period of time. They were arguing, I think one of the witnesses even said there was a span of 10 minutes between one of the first gunshot and a later gunshot. So certainly I think there was sufficient time for the alcohol that he had drank in his car to get into his system. Counsel, I know your focus has been on trial prejudice, but if you can't get these statements he made, 9-11 and the sheriff's deputies tossed, what is it that's missing from the state's case-in-chief? I mean he's admitted so much in those statements. Sure, he has not admitted to meaning to kill his wife. And in fact there is very strong persuasive evidence that he did not mean to kill his wife and he wanted her to live. My friend mentioned Shane Lee. Shane Lee testified, he was there to pick up his kids, that he heard this gunshot and looked in the room and saw Mr. Lankford and he said he was in shock and awe is how that he appeared. And we know that Mr. Lankford called 9-1-1, asked for a life flight to come. He was administering first aid to his wife. The court in ruling on the suppression motion listening to the 9-1-1 call said he was very concerned about his wife trying to save his The jury heard that in his voice too and that is really compelling evidence that he did not mean to kill his wife. The jury could have believed that he meant, as he told the police, that he was mad over the noise of the computer was making and was trying to shoot at the computer and because of his psychomotor depression from this combination of the volume and alcohol, he accidentally shot his wife and that it was a horrible tragedy but not what he intended to happen. Okay, counsel. Okay. Thank you very much. Thank you for your arguments.
judges: McKEOWN, SUNG, Fitzwater